IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DOE 1, *et al*,

               *Plaintiffs*,

    v.

UPPER SAINT CLAIR SCHOOL DISTRICT, *et al*,

               *Defendants*.

Civil Action No. 2:22-cv-112

Hon. William S. Stickman IV

## OPINION

WILLIAM S. STICKMAN IV, United States District Judge

The School Board of the Upper Saint Clair School District ("School Board") enacted a policy making the wearing of face masks optional, effective Monday, January 24, 2022. Plaintiffs are pseudonymous parents who bring this action "in their own capacity and as parent[s]" of Child Does 1-5. They allege that their children are "medically fragile disabled students" and that permitting families and students to choose whether to mask will subject them to increased risk of catching COVID-19 and increased risk of harm from the virus. (ECF No. 3). They allege that, in light of their children's medical conditions, the School Board's decision to make masking optional violates both Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973 ("Section 504" or "Rehabilitation Act"), 29 U.S.C. § 794(a). To be clear, Plaintiffs do not allege that the policy adopted by the School Board hinders their own child's ability to wear a mask. Rather, they allege that, by permitting other students and families to choose whether to wear masks, the policy violates the cited statutes. Plaintiffs ask the Court to issue an Order enjoining the Upper

Saint Clair School District ("School District") "from implementing the January 10, 2022, Board decision to eliminate the requirement of masks in the District until such time as the rate of community transmission is not at a rate of 'substantial' or 'high.'" (ECF No. 2-1). The effect of the requested relief would be that, notwithstanding the vote of the School Board, universal masking would be ordered to remain in place for an indefinite period, provided that transmission of COVID-19 remains "substantial" or "high" in Allegheny County.

The Court understands that the COVID-19 pandemic, including the reaction of governments and institutions to the pandemic, elicits strong feelings with regard to issues like masking and school policy. The Court is sensitive to the positions of both sides on these occasionally contentious issues and believes that each side proceeds from a position of good will. The Court's decision in this case, however, cannot be based on which position it believes is wiser or more prudent in light of the continually developing public health situation. Prudential judgments about policy are left to the people, through their elected officials. The Court's disposition of the requested temporary restraining order must be governed <u>solely</u> by the applicable standard of review and substantive law. After carefully reviewing the allegations pleaded and presented by Plaintiffs and the parties' respective arguments, in light of the appropriate standard and substantive law, the Court holds that Plaintiffs have failed to demonstrate a reasonable likelihood of success on the merits of their claims. As such, the Court must deny the requested temporary restraining order.[1]

---

[1] Counsel for Plaintiffs directed this Court to the recent decision of its esteemed colleague in this district, who has reached a different conclusion in a case involving similar issues. *See Doe 1 v. North Allegheny School District*, 2:22-cv-55, 2022 WL 170035 (W.D. Pa. Jan. 17, 2022). Counsel argues that this case and that matter are so similar vis-à-vis claims and issues that the Court should render the same decision. However, with both cases proceeding only on emergency motions thus far, it is impossible to determine with any degree of certainty how similar their facts, when fully developed, will be. Moreover, "there is no such thing as 'the law

# I.  FACTS AND PROCEDURAL HISTORY

On December 8, 2021, the Pennsylvania Supreme Court held that the Acting Secretary of the Pennsylvania Department of Health ("PADOH") lacked authority to enter an August 31, 2021, Order (with an effective date of September 7, 2021), requiring the wearing of "face coverings" while indoors, "regardless of vaccination status," for all K-12 public school districts in the Commonwealth of Pennsylvania.  (ECF No. 1, ¶¶ 83-84); *see Corman v. Acting Sec'y of Pa. Dep't of Health*, ____ A.3d _____, 2021 WL 6071796 (Pa. 2021).  In so doing, the decision to wear face coverings (*i.e.*, masking) in Pennsylvania schools was returned to the people through their elected directors to school boards.

Prior to the *Corman* decision, the School Board[2] adopted a Health and Safety Plan ("Plan"), on June 28, 2021, which required universal masking "because COVID-19 transmission rates in Allegheny County had increased from 'Moderate' in July to 'High' in early August." (ECF No. 1, ¶ 81).  The Plan was updated on August 18, 2021, and "the School District

---

of the district.'"  *Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991).  The Court of Appeals for the Third Circuit has held that district court decisions are not binding on other district courts within the district.  *Id.*  It has explained, "Even where the facts of a prior district court case are, for all practical purposes, the same as those presented to a different district court in the same district, the prior 'resolution of those claims does not bar reconsideration by this Court of similar contentions.  The doctrine of *stare decisis* does not compel one district court judge to follow the decision of another.'"  *Id.* (citation omitted); *see also Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting 18 James W. Moore et al., *Moore's Federal Practice* § 134.02[1][d] (3d ed. 2011)); *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 395 (3d Cir. 2017).  The Court must therefore conduct its own "independent analysis" in this case. *Threadgill*, 928 F.2d at 1371.

[2] The School District is the fifth largest school district in the Commonwealth of Pennsylvania, and it is charged with the education of over 8,600 students.  The School Board consists of nine individual directors, each of whom is elected for a term of four years.  (*Id.* ¶¶ 48-50, 102).  It is tasked with the management and supervision of the public elementary and secondary schools in the District and derives its authority to govern from the Pennsylvania Constitution and the rules and regulations of the Pennsylvania Department of Education.  (*Id.* ¶ 101).

continued to require universal masking in school buildings [(and on school buses)] while the rate of transmission of COVID-19 remained in a high transmission rate of infection in Allegheny County." (*Id.* ¶ 82); (ECF No. 1-3, p. 5). The Plan required masks "for all students, staff, volunteers, and visitors indoors in all district K-12 schools" and mandated that they "be well-fitting, properly worn, and in line with CDC mask recommendations." (*Id.*). At the same time, it permitted students to remove masks when outside, when eating/drinking at least six feet from others, and "during a mask break (outside of classroom and at least 6 ft. of distance)." (ECF No. 1-3, p. 5). As to student athletes participating in indoor sports, they were to remain masked "unless it would be unsafe for them to do so." (*Id.*). Furthermore, students engaging in high-intensity activities (*e.g.*, running or wrestling) were permitted "to temporarily remove their mask if it causes difficulty breathing, creates or exacerbates a medical respiratory condition, or creates a safety concern." (*Id.*). Staff could remove masks when outside, when alone in workplaces, when eating/drinking at least six feet from others, and "when wearing a mask creates an unsafe condition in which to operate equipment or execute a task." (*Id.*).

After the issuance of the Pennsylvania Supreme Court's decision, the School Board voted on January 10, 2022, by a 7-2 majority, to update the Plan, and it eliminated the universal masking requirement in school buildings. (*Id.* ¶ 85). Effective January 24, 2022, mask wearing will be optional in school buildings. The new Plan "strongly recommends face coverings for all students, staff, volunteers, and visitors indoors in all District K-12 schools regardless of vaccination status. Masks should be well-fitting, properly worn, and in line with CDC mask recommendations." (ECF No. 13, pp. 3-4). It goes on to state that the School District will "comply with any local, state, and/or federal requirements for face coverings/masks, as

applicable." (ECF No. 13, p. 4). The physical distancing provisions remained the same as those contained in the August 18, 2021, Plan. (ECF No. 1-3, p. 6; ECF No. 13, p. 4).

On January 19, 2022, five groups of parents brought this action against the School District and its nine School Board members for declaratory and injunctive relief on their own behalf and as parents of children who are "medically vulnerable to COVID-19," and on behalf of "a class of similarly situated disabled children who are at severe risk of illness and injury due to their disabilities [. . .]." (ECF No. 1, pp. 1-2). They contend that the School District has 400 "medically fragile disabled students," "just under 100 students that either had cancer or have some type of autoimmune deficiency," and "300 additional students that suffer from upper respiratory conditions." (*Id.* ¶¶ 11-13). More specifically, they allege that these 400 students' disabilities vary, but include: (a) lung disease, including asthma, chronic obstructive pulmonary disease (*e.g.*, bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) hypertension; (f) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (g) blood disorders (including sickle cell disease); (h) inherited metabolic disorders; (i) history of stroke; (j) neurological or developmental disability; (k) cancer or cancer treatments; and/or (l) muscular dystrophy or spinal cord injury. (*Id.* ¶ 121).

As to the child Plaintiffs named in the Complaint, Child Doe 1's medical conditions include Chiari Malformation type one, Gastroparesis with g-tube, Ehlers Danlos Syndrome (EDS), hypermobile variant (hEDS), Medical PTSD, and anxiety. (*Id.* ¶ 147). Child Doe 2's

medical conditions include a rare autoimmune disease, Juvenile Dermatomyositis.  (*Id.* ¶ 157). Child Doe 3's medical conditions include asthma, Sensory Processing Disorder, and hypoglycemia.  (*Id.* ¶ 165).  Child Doe 4's medical conditions include Autism Spectrum Disorder, Moderate Persistent Asthma without complication, "Body Mass Index (BMI), pediatric of 95-99% for age, obese child structured management/multidisciplinary intervention category," and "vision challenges and executive function challenges."  (*Id.* ¶¶ 173-74).  Child Doe 5's medical conditions include Charcot Marie Tooth (CMT) and epilepsy.  (*Id.* ¶ 180).

On August 14, 2021, Allegheny County's COVID-19 community transmission level was moved from substantial to high.  (*Id.* ¶ 80).  Plaintiffs aver that the Centers for Disease Control and Prevention ("CDC"), the American Academy of Pediatrics, the PADOH, the Pennsylvania Department of Education, and the Allegheny County Department of Health ("ACDOH") have recommended that school children should universally mask while in school buildings due to the high transmission rate of infection from COVID-19 in Allegheny County.  (*Id.* ¶¶ 15, 72-73). According to Plaintiffs, "The Board's vote neither accounts for the fact that transmission rate of infection from COVID-19 was still in the "High" category on January 10, 2022 and that it continues to dramatically increase because of Omicron, nor that universal masking is essential to the prevention of the spread of this airborne disease."  (*Id.* ¶ 10).  Quite simply, they believe that the Board "arbitrar[il]y and capriciously" voted on January 10, 2022, to "remove the protection provided by universal masking from the District as of January 24, 2022."  (*Id.* ¶ 29).

In Count I of their Class Action Complaint, Plaintiffs allege discrimination on the basis of disability in violation of Title II of the ADA.  (*Id.* ¶¶ 132-88).  In Count II, Plaintiffs allege Defendants violated Section 504 of the Rehabilitation Act.  (*Id.* ¶¶ 189-202).  Along with their Complaint, Plaintiffs requested an emergency temporary restraining order ("TRO") enjoining the

School Board from enforcing the vote of January 10, 2022 (permitting optional masking) "until such time as the rate of community transmission is not at a rate of 'substantial' or 'high.'" (ECF No. 2-1, p. 1). They desire universal masking "for students, staff, visitors for grades K-12, while indoors, and riding on school buses." (ECF No. 3, p. 33). Additionally, Plaintiffs seek a preliminary injunction enjoining Defendants from enforcing the School Board vote of January 10, 2022. (ECF No. 1, ¶ 205; ECF No. 2-1; ECF No. 3). The Court held an expedited hearing on the TRO request on January 20, 2022. The parties elected to present oral argument. (1/20/2022 Transcript of Oral Argument ("Tr."), p. 3).[3]

At oral argument, Defendants represented to the Court that all students K-12 are eligible for vaccination. (*Id.* at 31). Currently, 75% of students ages 12 to 18 are fully vaccinated, and 90% of staff are fully vaccinated. (*Id.* at 34). The School District hosted vaccination clinics for school staff and students 16 and older, and it stated that "students ages 5 to 11 are all eligible to be fully vaccinated and have had time to do so prior to the change in policy," effective January 24, 2022. (ECF No. 1-3, p. 8; ECF No. 13, p. 6); (Tr. at 34). Defendants also informed the Court that the School District has a health and safety team that collaborates with the ACDOH, other school superintendents in Allegheny County, and epidemiologists. The team has weekly meetings with Dr. Brink of the ACDOH. (Tr. at 34-35). During the past seven days, Defendants reported that there was a decrease of 581 per 100,000 cases in Upper Saint Clair Township. (*Id.* at 45).

Defendants expressed frustration in being unable to positively identify the five child Plaintiffs so as to ascertain if accommodations could be made in the school setting that would

---

[3] Due to the time constraints under which the Court had to issue its decision, an official copy of the transcript of oral argument has not yet been filed of record on the docket. The Court ordered the parties to split the cost of its production. (ECF No. 12). Citations to the transcript contained herein are from a rough draft provided to the Court by the Court Reporter.

reasonably allow them to participate in in-person learning. (*Id.* at 38-39). Defendants stated that the School District can accommodate medically fragile disabled students "both in-person and through remote learning opportunities," other than cyber school, which is available to all students—not only those needing medical accommodations. (*Id.* at 39, 47, 49-50). Prior to this lawsuit, the School District has been providing accommodations of "enhanced PPE for students like NK95 or N95 masks," separating immunocompromised students from unvaccinated students, and temporary homebound instruction in the form of a teacher sent to a student's house. (*Id.* at 39-43). Defendants emphasized that even if the TRO were granted, there will still be students with mask exemptions and various situations where both students and staff can remove masks inside school buildings. (*Id.* at 43-44). They urged the Court to deny the TRO, and allow the Plan, voted on by the School Board after much public debate and public hearings involving expert testimony (*Id.* at 50-51), to become effective January 24, 2022.

## II. STANDARD OF REVIEW

The standard of review governing whether a temporary restraining order is appropriate is well established:

> If there is a possibility that irreparable injury will occur before the hearing on a preliminary injunction required by Rule 65(a) can be held, a temporary restraining order may be available under Rule 65(b). Injunctive relief in any form is an extraordinary remedy that should be granted in limited circumstances. The standard used to evaluate whether the issuance of a temporary restraining order is warranted is the same as that used to evaluate whether the issuance of a preliminary injunction is appropriate. The court considers four factors in determining whether to grant a preliminary injunction. A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) it will suffer irreparable harm if the injunction is denied; (3) granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief.

*Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 588-89 (W.D. Pa. 2009) (internal citations omitted). It is the movant's burden to establish the requirements for injunctive relief, particularly the first two prongs. *See Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975).

## III. ANALYSIS

### A. Plaintiffs have not demonstrated a reasonable likelihood of success on the merits.

Plaintiffs base their claims on the contention that the School Board's decision to make masking optional—left to the choice of students and their families—violates the ADA and Section 504 of the Rehabilitation Act. There is no allegation, nor have facts been adduced, to suggest that any policy of the School Board prevents Plaintiffs' children from masking. They remain free to do so. Rather, they contend that unless the School Board requires the entire school community to mask, it will subject them to an increased risk of COVID-19 infection, which could increase their chances of suffering a severe case. Their request for injunctive relief is premised on the position that universal masking is the only reasonable accommodation to which they are entitled under the ADA and the Rehabilitation Act.

As explained below, the Court holds that Plaintiffs are not entitled to the requested relief because they have not established a reasonable likelihood of success on the merits. "To find that plaintiffs are likely to prevail on the merits, '[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a [p]rima facie case showing a reasonable probability that it will prevail on the merits." *Trefelner*, 655 F. Supp. 2d at 589 (quoting *Oburn*, 521 F.2d at 148). Plaintiffs cannot do so for three reasons: (1) it is unlikely that Plaintiffs will be able to demonstrate the injury-in-fact necessary to confer Article III standing; (2) it is likely that Plaintiffs failed to exhaust

administrative remedies; and (3) Plaintiffs are unlikely to prevail on a substantive basis because the accommodation that they seek is not reasonable.

### 1. Article III Standing

As a threshold matter, Article III of the Constitution provides that federal courts may only exercise jurisdiction over "Cases" and "Controversies." U.S. Const. art. III, § 2. The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). As the "part[ies] invoking federal jurisdiction," Plaintiffs bear the burden of establishing standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560-61). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560). Here, Plaintiffs have not demonstrated a reasonable likelihood of success on the threshold question of standing. Their claims fail to establish the requisite injury-in-fact.

The Court's examination of this issue was informed by a recent decision of the United States Court of Appeals for the Fifth Circuit, which, while not binding on this Court, presented substantially similar issues to those at bar. *See E.T. v. Paxton*, 19 F.4th 760 (5th Cir. 2021). In *Paxton*, the Fifth Circuit imposed a stay pending the appeal of an injunction barring the enforcement of Texas Governor Greg Abbott's Executive Order GA-38, which prohibited local governmental entities from imposing mask mandates. *Id.* at 763. A challenge to GA-38 was

brought in federal court by parents of children with a variety of health conditions.[4]  They alleged

that enforcement of GA-38 (barring school districts from requiring universal masking) denied

their children a quality public education because of their disabilities and, thus, violated the ADA,

the Rehabilitation Act, the Individuals with Disabilities Education Act ("IDEA") and the

American Rescue Plan Act.  The district court granted an injunction barring the enforcement of

GA-38.  The Fifth Circuit, however, stayed the injunction pending appeal, holding, *inter alia*,

that the plaintiffs failed to establish standing and, therefore, they could not establish a reasonable

likelihood of success on the merits.

The Fifth Circuit explained that, while the plaintiffs surely alleged that each of their

children had a disability "that leaves them particularly vulnerable during the pandemic," they

"likely falter in showing any concrete, or actual or imminent, injury as a result of the

enforcement of GA-38."  *Id.* at 765.  It reasoned:

> Plaintiffs assert that the injury threatened by the enforcement of GA-38 "was and
> is the deprivation of meaningful access to in-person school," or, as the district
> court characterized it, that plaintiffs "are either forced out of in-person learning
> altogether or must take on unnecessarily greater health and safety risks than their
> nondisabled peers."  But plaintiffs have not shown that they face such an
> "either/or" choice as a result of GA-38, and the district court's conclusion that
> they do was likely erroneous.

*Id.*  The Fifth Circuit rejected the contention presented by the plaintiffs, that, absent mandated

universal masking, their health conditions would force them out of school and deprive them of a

meaningful education—a deprivation that plaintiffs alleged conferred standing upon them.  It

explained:

> A concrete injury must be *de facto*; that is, it must actually exist.  When the
> Supreme Court has used the adjective concrete, it has meant to convey the usual
> meaning of the term—real, and not abstract.

---

[4]  These conditions included down syndrome, asthma, hypogammaglobulinemia, cerebral palsy,
heart defects, bronchomalacia, bronchiectasis, spina bifida, and epilepsy.  *Id.*

> The risks of contracting COVID-19 for these plaintiffs are certainly real, but the alleged injury to plaintiffs *from the enforcement of GA-38* is, at this point, much more abstract. This is so because the binary choice envisioned by the district court—either stay home or catch COVID-19—is a false one: it wholly elides the various accommodations available to the plaintiffs (e.g., distancing, voluntary masking, class spacing, plexiglass, and vaccinations) to ensure a safer learning environment, regardless of GA-38's prohibition of local mask mandates.

*Id.* at 765-66 (internal citations omitted) (cleaned up). Furthermore, the Fifth Circuit pointed out that under established caselaw, a showing of some increased risk of harm will not be deemed an actual injury. *Id.* at 766 (citing *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 424 (5th Cir. 2020); and *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007) (Kavanaugh, J.)). Thus, the Fifth Circuit held that the plaintiffs failed to establish an actual and concrete injury-in-fact, as required for Article III standing.

The Fifth Circuit's decision in *Paxton* is consistent with precedent from our own circuit. In *Reilly v. Ceridian Corporation*, 664 F.3d 38 (3d Cir. 2011) (Aldisert, J.), the United States Court of Appeals for the Third Circuit held that the plaintiffs lacked standing because an increased risk of harm does not constitute the injury-in-fact required to establish a case or controversy under Article III. The plaintiffs in *Reilly* were employees of a law firm who sued their payroll service provider after a data breach permitted access to private personal information. *Id.* at 40. They alleged that, as a result of the breach, they incurred harm in the form of "an increased risk of identity theft," emotional distress, and expenses associated with monitoring their credit activity. *Id.* The district court dismissed the case on the ground that plaintiffs lacked Article III standing, and the Third Circuit affirmed. *Id.* at 41.

In examining the standing issue, the Third Circuit reiterated the long-established Supreme Court precedent that "[c]onstitutional standing requires 'an injury-in-fact, which is an invasion of

a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Id.* at 41-42 (citations omitted). Further, an injury-in-fact "must be concrete in both a qualitative and temporal sense. The complainant must allege an injury to him/herself that is, 'distinct and palpable,' as distinguished from merely 'abstract,' and the alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

The Third Circuit held that the plaintiffs' "allegations of hypothetical, future injury [were] insufficient to establish standing." *Id.* at 42. It explained that the injury alleged by the plaintiffs was merely "speculation" about harm that might occur in the future as a result of the defendant's conduct. And it went on to state:

> The Supreme Court has consistently dismissed cases for lack of standing when the alleged future harm is neither imminent nor certainly impending. For example, the *Lujan* Court addressed whether plaintiffs had standing when seeking to enjoin the funding of activities that threatened certain species' habitats. The Court held that plaintiffs' claim that they would visit the project sites "some day" did not meet the requirement that their injury be "imminent." 504 U.S. at 564 n.2 ("[W]e are at a loss to see how, as a factual matter, the standard can be met by respondents' mere profession of an intent, some day, to return."). [The plaintiffs'] allegations here are even more speculative than those at issue in *Lujan*. There, the acts necessary to make the injury "imminent" were within plaintiffs' own control, because all plaintiffs needed to do was travel to the site to see the alleged destruction of wildlife take place. Yet, notwithstanding their stated intent to travel to the site at some point in the future—which the Court had no reason to doubt—their harm was not imminent enough to confer standing. *See id.* Here, [the plaintiffs'] alleged increased risk of future injury is even more attenuated, because it is dependent on entirely speculative, future actions of an unknown third-party.
>
> The requirement that an injury be "certainly impending" is best illustrated by *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). There, the Court held that a plaintiff lacked standing to enjoin the Los Angeles Police Department from using a controversial chokehold technique on arrestees. *See Lyons*, 461 U.S. at 105-106. Although the plaintiff had already once been subjected to this maneuver, the future harm he sought to enjoin depended on the police again arresting and choking him. *See id.* at 105. Unlike the plaintiff in *Lyons*, [the plaintiffs] in this case have yet to suffer any harm, and their alleged increased risk of future injury

is nothing more than speculation. As such, the alleged injury is not "certainly impending." *Lujan*, 504 U.S. at 564 n.2.

*Reilly*, 664 F.3d at 42-43.

In applying the jurisprudence cited above to this case, it is important to focus on the injury alleged in the Complaint. Plaintiffs assert that the School Board's decision to make masking optional places Child Does 1-5, described as "medically fragile" students, in greater risk of contracting COVID-19. This, in turn, could lead to severe health consequences or even death. They allege that this increased risk of contracting COVID-19, stemming from the School Board's decision to adopt a mask-optional policy, "has put the parents of medically vulnerable students in the position of having to decide whether to keep their children at home where they will likely suffer continual learning loss or risk placing them in an environment that presents a serious risk to their health and safety." (ECF No. 1, ¶ 30).

The Court holds that Plaintiffs have failed to assert harm that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Reilly*, 664 F.3d at 41-42 (citations omitted). At its core, the Complaint alleges that the School Board's Plan creates an increased risk of infection from Covid-19 (and attendant injury) which is beyond Plaintiffs' toleration and will cause them to keep their children from physically attending school. But Plaintiffs cannot plead or prove that absent universal masking they *will* contract COVID-19. Nor, conversely, can they plead or prove that even with universal masking they *will not* contract COVID-19.[5] Both scenarios are entirely speculative. As such, Plaintiffs present what must be characterized as a claim relating to an increased risk of a hypothetical future injury that may

---

[5] Counsel for the School District represented that, even with universal masking, the school experienced a surge of cases with the onset of the Omicron variant. (Tr. at 43). This highlights the fact that individuals wearing masks can still become infected with COVID-19.

never occur, or which may still occur even if the relief that they seek is granted.[6]  Indeed, Plaintiffs' Motion for Emergency TRO concedes that the gravamen of their action is an "increased risk of harm" claim, for which they seek injunctive relief:

> Plaintiffs herein request this Court issue a Temporary Restraining Order by January 21, 2022 to protect Plaintiffs' children from **the increased risk of infection** by COVID-19 caused by the removal of the universal mask mandate and permit continued access to the school building by the medically fragile disabled children.

(ECF No. 2, ¶ 6) (emphasis added).  Notably, in concluding his oral argument, Plaintiffs' counsel stated, "[W]e don't want to place our children into a situation where there's **an increased risk of harm** caused by discriminatory effect[7] from the policy."  (Tr. at 26) (emphasis added).

This case falls squarely within the holding of *Reilly* that "allegations of hypothetical, future injury do not establish standing under Article III." *Reilly*, 664 F.3d at 41.  To constitute an injury-in-fact, "a threatened injury must be 'certainly impending,' and 'proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all.'"  *Id.* at 42. (citations omitted).  No such certainly impending and immediate injury has been asserted here.

The Court agrees with the rationale of the Fifth Circuit that "the binary choice envisioned by [Plaintiffs]—either stay home or catch COVID-19—is a false one." *Paxton*, 19 F.4th at 766.  Plaintiffs are not faced with that binary choice and, indeed, the School District explained that there are other means of protection from infection than universal masking.  For example, School

---

[6] While the Court focuses on the injury-in-fact requirement, the fact that infections may continue to occur with universal masking in place casts great doubt as to whether Plaintiffs can satisfy the redressability element of Article III standing.

[7] Although occasionally referencing discrimination in their papers and at oral argument, Plaintiffs' counsel acknowledged that this case raises reasonable accommodation claims, rather than claims for discrimination on account of disability.  (Tr. at 10).

District policy provides for a wide array of alternative measures to protect students from COVID-19, including, but not limited to, physical distancing, ventilation, isolation, quarantine and contact tracing measures, cyber and alternative instruction, a strong encouragement of vaccines, and a school community that is largely vaccinated. Nevertheless, Plaintiffs take the position that, absent universal masking, they will face an unacceptable risk if they attend school in person. This risk, though, is just that—a risk. It is not a concrete and imminent injury.

The Court holds that Plaintiffs are unlikely to be able to demonstrate the type of injury-in-fact necessary to constitute a case and controversy—and thus confer standing—under Article III of the Constitution. As such, they are not reasonably likely to succeed on the merits of their claims. The requested TRO must, therefore, be denied.

### 2.   Exhaustion of Administrative Remedies

Additionally, Plaintiffs cannot show a reasonable likelihood of success on the merits because they were likely required to exhaust administrative remedies prior to bringing their ADA and Rehabilitation Act claims in court. The exhaustion requirement stems not from the ADA or the Rehabilitation Act, themselves, but rather from the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1482. That statute provides federal funds to states for the education of children with disabilities. *See T.R. v. Sch. Dist. of Phila.*, 4 F.4th 179, 182–83 (3d Cir. 2021). Participating states must provide a "free appropriate public education"—also known as "FAPE"—to all eligible children. 20 U.S.C. § 1412(a)(1)(A). FAPE includes "special education and related services" that "are provided in conformity with each child's individualized education program," or "IEP." *Id.* § 1401(9)(D); *see also id.* §§ 1401(29) (defining "special education"); § 1414(d)(1)(A) (defining "IEP"). "In requiring individualized education programs,

the 'IDEA operates from the premise that each child will have unique disabilities and presumes that each program will be personalized.'" *T.R.*, 4 F.4th at 183 (citation omitted).

The IDEA provides a civil cause of action for the denial of a FAPE. 20 U.S.C. § 1415(i)(2). But the statute imposes a prerequisite to the filing of such an action: aggrieved parties must first comply with the IDEA's "administrative process before resorting to federal court." *Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir. 1994); *see also* 20 U.S.C. § 1415 (setting forth an administrative mechanism for resolving IDEA disputes). The Supreme Court has summarized the exhaustion process:

> Because parents and school representatives sometimes cannot agree on such issues, the IDEA establishes formal procedures for resolving disputes. To begin, a dissatisfied parent may file a complaint as to any matter concerning the provision of a FAPE with the local or state educational agency (as state law provides). See [20 U.S.C.] § 1415(b)(6). That pleading generally triggers a "[p]reliminary meeting" involving the contending parties, § 1415(f)(1)(B)(i); at their option, the parties may instead (or also) pursue a full-fledged mediation process, see § 1415(e). Assuming their impasse continues, the matter proceeds to a "due process hearing" before an impartial hearing officer. § 1415(f)(1)(A); see § 1415(f)(3)(A)(i). Any decision of the officer granting substantive relief must be "based on a determination of whether the child received a [FAPE]." § 1415(f)(3)(E)(i). If the hearing is initially conducted at the local level, the ruling is appealable to the state agency. See § 1415(g). Finally, a parent unhappy with the outcome of the administrative process may seek judicial review by filing a civil action in state or federal court. See § 1415(i)(2)(A).

*Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017). This administrative process, therefore, "serves the purpose of developing the record for review on appeal, encouraging parents and the local school district to work together to formulate an IEP for a child's education, and allowing the education agencies to apply their expertise and correct their own errors." *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 275 (3d Cir. 2014) (internal citations omitted).

Significantly, the IDEA's exhaustion requirement extends beyond IDEA claims. It also governs claims brought under "other Federal laws protecting the rights of children with disabilities"—including the ADA and the Rehabilitation Act—where such claims "seek[] relief

that is also available under [the IDEA]." 20 U.S.C. § 1415(*l*).   To determine if IDEA's

exhaustion requirement applies to a particular claim, courts must apply the test set forth by the

Supreme Court in *Fry*:

> One clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions.   First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library?   And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?   When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward.   But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

*Fry*, 137 S. Ct. at 756; *see also T.R.*, 4 F.4th at 185–86; *Wellman v. Butler Area Sch. Dist.*, 877

F.3d 125, 132 (3d Cir. 2017).

In deciding this case, the Court looked to the persuasive reasoning of the court in *Hayes*

*v. DeSantis*, ____ F. Supp. 3d _____, 2021 WL 4236698 (S.D. Fla. Sept. 15, 2021).   That case

presented similar claims to those raised by Plaintiffs here.   The plaintiffs were the parents of

eleven students enrolled in eight public school districts in Florida who had "unique health-related

concerns that they allege[d] ma[de] attending school without a 'universal mask mandate'

difficult or impossible."   *Id.* at *2.   The plaintiffs asked the district court to enjoin Florida

Governor Rick DeSantis' Executive Order 21-175, which, in essence, permitted parents to opt-

out of any district-imposed mask mandates.   *Id.* at *1.   They alleged that by preventing school

districts from enacting universal masking, Executive Order 21-175 violated the ADA because it

precluded them from getting an appropriate in-person education "without jeopardizing their lives

or safety."   *Id.* at *5.

The court denied the injunction, holding that the plaintiffs were not reasonably likely to succeed on the merits.  As a primary reason, the court pointed out that plaintiffs failed to exhaust administrative remedies.   The defendant argued, and the court agreed, that although the plaintiffs' claims were, facially, under provisions of the ADA, they were, in actuality, based upon denial of a FAPE and, therefore, subject to the exhaustion requirements of the IDEA. *Id.* at *6-8.  The court explained that "[w]here claims arising under the ADA and Rehabilitation Act are asserted in the context of public education, the question of . . . administrative exhaustion . . . under the IDEA is implicated." *Id.* at *6.

The *Hayes* court examined and applied the two critical questions of the *Fry* test and held that both required a negative answer.  First, the court looked to the substance of the allegations set forth in the plaintiffs' complaint and determined that they were inextricably intertwined with issues relating to access to education.  It concluded that "the gravamen of Plaintiffs' claims concerns the denial of FAPE.  Plaintiffs cannot simply state that their claim does not concern FAPE, despite the foregoing, and have the Court avert its eyes to the obvious nature of this case." *Id*. at *8.  "Thus, the answer to the first question in *Fry*, which asks, 'could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say a public theater or library?' is no." *Id.* (quoting *Fry*, 137 S. Ct. at 756).

The second question—"could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance?"—was also answered in the negative. *Id.* at *8 (quoting *Fry*, 137 S.Ct. at 756).   The court again focused on the gravamen of the complaint, which focused exclusively on the alleged deprivation of an adequate in-person education absent universal masking.  It explained that "an adult at the school, who is not enrolled therein, cannot

press claims that are premised upon a denial of FAPE, to which they are not entitled." *Id.* Because both questions of the *Fry* test were answered in the negative, the court held that exhaustion was required. Absent exhaustion, the court found that the plaintiffs were unlikely to prevail on the merits of their claim and denied the requested injunction. *Id.* at *9.

Applying the *Fry* test here, the Court concludes that "the gravamen of Plaintiffs' [ADA and Rehabilitation Act] claims is the denial of a FAPE," meaning that "those claims are subject to the IDEA's exhaustion requirement." *T.R.*, 4 F.4th at 195. As to the first prong of the *Fry* analysis, there is no question that Plaintiffs could not "have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school." *Fry*, 137 S. Ct. at 756. Plaintiffs' Complaint and Motion for TRO, as well as the oral argument of counsel, focused *exclusively* on their access to a full in-person educational experience. The language of the Emergency Motion for TRO highlights this singular focus:

> 5. Plaintiffs further allege that Defendants' refusal to make reasonable accommodations **necessary to allow the disabled children, and those similarly situated, to safely access the school buildings and thus have <u>equal access to education</u>** is in direct conflict with the express requirements of the Americans with Disabilities Act ("ADA"), which Congress created to serve the strong public interest in seeing persons with disabilities treated equally and fairly by society.

> 6. Plaintiffs herein request this Court issue a Temporary Restraining Order by January 21, 2022 to protect Plaintiffs' children from the increased risk of infection by COVID-19 caused by the removal of the universal mask mandate and permit **continued access to the school building** by the medically fragile disabled children.

(ECF No. 2, ¶¶ 5-6) (emphasis added).

As in *Hayes*, the Court holds that the gravamen of Plaintiffs' claim is so myopically centered upon access to a FAPE (even though their pleadings don't specifically use the term) that it cannot reasonably hold that the claims could apply equally to other places, such as "a public

theater or library." *Fry*, 137 S. Ct. at 756. Indeed, the Court specifically asked counsel whether Plaintiffs' claim may be interpreted broadly to apply to other institutions in society—requiring them to mandate universal masking to accommodate Child Does 1-5. Counsel acknowledged what was already evident from the face of Plaintiffs' papers—that the focus of their case was access to the school:

> THE COURT: Well, then if you're just looking at accommodations, doesn't what you're asking me to do today apply far beyond school districts? If it's beyond the specific right to a public education, and it's just an accommodation under the Americans with Disabilities Act for an immunocompromised person, be it a child or an adult or not, isn't the conclusion of your position then that any workplace that has an immunocompromised person must have universal masking? Any place of commerce that has an immunocompromised -- you must have -- you must make an accommodation, which must be, and is limited to, universal masking?
>
> I mean doesn't this go far beyond th[a]n if you're not making this claim on access to education per [se], but a broader health accommodation, doesn't it attach itself to broader community entities than schools?
>
> MR. BEHREND: I think it comes down to an individualized assessment of whether they're making a reasonable accommodation, Your Honor. That would be the standard to apply. ***I don't think this is a blanket application to other situations***.

(Tr. at 23-24) (emphasis added). This position is consistent with a reading of the Complaint, as a whole, which singularly focuses on the alleged deprivation access not merely to the school buildings, but to the educational experience inherent in in-person instruction. Thus, a fair reading of Plaintiffs' Complaint and their argument to the Court on this emergency motion requires the Court to answer the first *Fry* question in the negative—Plaintiffs have not and could not have brought the same claim, raising the same issues and arguments, against some other public institution.

As to the second question of the *Fry* analysis—"could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?"—the Court reaches the same

conclusion for the same reasons. *Fry*, 137 S. Ct. at 756. The gravamen of Plaintiffs' Complaint focuses solely on access—not merely to facilities, but to the benefits of in-person educational programming. The claims in this case simply do not translate to claims of other employees or visitors unrelated to access to education. Further, as Plaintiffs conceded, the claims before the Court do not "have blanket application to other situations." (Tr. at 24). Thus, the answer to the second *Fry* question must be "no."

Because the answer to both prongs of the *Fry* test are "no," Plaintiffs were likely required to exhaust administrative remedies before bringing this action unless an exception to exhaustion applies. The Third Circuit has explained that "a plaintiff's failure to exhaust may be excused 'where: (1) exhaustion would be futile or inadequate; (2) the issue presented is purely a legal question; (3) the administrative agency cannot grant relief; [or] (4) exhaustion would cause severe or irreparable harm." *T.R.*, 4 F.4th at 185 (citation omitted). But this case does not satisfy any of those exceptions.

First, the Court cannot hold that exhaustion would be futile or inadequate in this case. True, attempts to exhaust may not provide Plaintiffs with the specific accommodation that they seek—universal masking of all students—but this does not render exhaustion futile. Defendants' counsel explained that the School District has a history of working with students to craft accommodations relating to all sorts of health issues and threats, including COVID-19. (Tr. at 38-43). Moreover, the School District's written policies show a number of other health and safety measures that it takes and show that it works with individual students to craft individual accommodations. Plaintiffs do not know to what extent some mutually acceptable accommodation could have been reached because they bypassed the entire administrative process.

In *Hayes*, the district court rejected a contention of futility where, as here, the plaintiffs believed that the only reasonable accommodation was the imposition of universal masking. *Hayes*, 2021 WL 4236698, at *9. The court observed that the plaintiffs each presented with their own individualized health conditions and that there were "unique problems facing Plaintiffs, which require unique solutions." *Id.* at *11. Thus, the court found that "all Plaintiffs would be substantially benefited by pursuing administrative remedies that can provide tailored solutions to each child's individual needs." *Id.* Here, the Court makes the same determination.

Second, the issue before this Court is not a pure question of law. Rather, the Complaint presents a number of facts supporting Plaintiffs' theory that the absence of universal masking increases their risk of harm by COVID-19, that this increased risk of harm may deprive them of an in-person educational experience, and that this alleged deprivation will have significant negative consequences for the child Plaintiffs. There are, therefore, a number of factual issues implicated by their claims.

Third, as to the ability of the administrative agency to grant relief, the Court refers back to its decision on futility and the decision of the *Hayes* court on that prong. To the extent that Plaintiffs contend that *only* a return to universal masking will be a reasonable accommodation, it is unlikely that the School Board will grant relief—although there is no question that it has the authority to do so. Critically, however, Defendants, through counsel, have unequivocally expressed their willingness to work with Plaintiffs to explore a host of possible accommodations. Availing themselves of the administrative process may lead Plaintiffs to discover that one or more accommodations short of requiring universal masking may provide them satisfactory relief.

Finally, the Court holds that exhaustion would not cause severe or irreparable harm. Even if Plaintiffs decide against sending their children to school pending the exhaustion process,

the Court declines to find that it would cause severe or irreparable harm.  Defendants explained that there are multiple virtual options available to facilitate in-home instruction and that students have chosen to use those options for a variety of reasons, some related to health and some not. (Tr. at 49-50).  When looking at this case as a whole, Plaintiffs have not demonstrated that the time required for them to complete the exhaustion process would cause severe or irreparable harm.

In short, none of the exceptions to the exhaustion requirement apply.  Because Plaintiffs have, by their own admission, not attempted to exhaust administrative remedies, (Tr. at 20-24), they have not met their burden of showing a reasonable likelihood of success on the merits of their claims.

### 3.   Reasonable Accommodation

Finally, turning to the underlying substantive law, Plaintiffs bring claims under Title II of the ADA (42 U.S.C. § 12132) and Section 504 of the Rehabilitation Act (29 U.S.C. § 794(a)). Those statutes are designed to eliminate discrimination against individuals with disabilities.  *See Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 114–15 (3d Cir. 2018).   In furtherance of that aim, both the ADA and the Rehabilitation Act "require public entities, including [schools], to provide, in all of their programs, services, and activities, a reasonable accommodation to individuals with disabilities." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 287 (3d Cir. 2019).

To state a claim under the ADA or the Rehabilitation Act, a plaintiff must establish that "[1] he is a qualified individual with a disability, [2] who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, [3] by reason of his disability." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 288–89 (3d Cir. 2019); *see also*

*Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009).[8]   In this case, Plaintiffs have clarified that they are bringing only a failure-to-accommodate claim, not a more general disability-based discrimination claim.   (Tr. at 10).   They must therefore show, as to the second element, that the public entity failed to provide a reasonable accommodation.   *See Muhammad v. Ct. of Common Pleas of Allegheny Cnty., Pa.*, 483 F. App'x 759, 763–74 (3d Cir. 2012) (per curiam).   The third element (causation) then requires proof that, "but for the failure to accommodate, [Plaintiffs] would not be deprived of the benefit[s] [they] seek[]." *Id.* at 764.

Failure-to-accommodate claims, moreover, involve a "tripartite inquiry": "(1) whether the requested accommodation is reasonable; (2) whether it is necessary; and (3) whether it would fundamentally alter the nature of the program." *Berardelli*, 900 F.3d at 123 (citations omitted). Plaintiffs "b[ear] the initial burden of demonstrating that [their] requested accommodations are reasonable" and "necessary to permit [their] meaningful participation." *Muhammad*, 483 F. App'x at 763.   The burden then shifts to Defendants "to demonstrate that the requested accommodations were unreasonable," *id.*, or would require "'substantial' changes to the school's programs," *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 280 (3d Cir. 2012) (citation omitted). Significantly, a public entity need not provide every accommodation that is requested or preferred—it need only provide an accommodation that is *reasonable. See, e.g., Berardelli*, 900 F.3d at 125 ("[A] plaintiff 'may not insist on a particular accommodation if another reasonable accommodation was offered.'" (citation omitted)); *Pahlavan v. Drexel Univ. Coll. of Med.*, 438

---

[8] "Whether suit is filed under the Rehabilitation Act or under the [ADA], the substantive standards for determining liability are the same." *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995) (citation omitted).   However, the Rehabilitation Act requires "the additional showing that the program receives federal financial assistance." *Chambers*, 587 F.3d at 189 n.20 (citing 29 U.S.C. § 794(a)).

F. Supp. 3d 404, 421 (E.D. Pa. 2020) ("The ADA . . . does not require an institution to provide all of the accommodations that an individual requests.").

The School District's most recent Plan—adopted on January 10, 2022, by the School Board and effective January 24, 2022—has been submitted to the Court and made part of the record in this case. (ECF No. 13). There is no question that the School District has enacted a number of safety measures designed to curb the spread of COVID-19. These measures include, but are not limited to, the following:

- **Physical distancing**: Students are distanced at 3 feet apart to the maximum extent possible; staggered release between instruction, etc.[9]

- **Cleaning and ventilation**: Daily cleaning by custodial staff; nutrition centers utilize a timed cleaning schedule in all food preparation areas. Use MERV 13, 14 and 15 filters in HVAC units. Adjust air turnover rates to exceed ASHRAE standards and increase outside airflow into buildings. Change all filters. Run exhaust fans continuously during winter months.

- **Contact tracing**: District follows all quarantine and contact tracing directed by ACH/DOH.

- **Diagnostic and Screening Testing**: Using the symptom/exposure screening tool, parents/guardians are asked to complete a daily health check on students prior to leaving the house for school. School staff are available to assist with symptom/exposure screening upon arrival (due to varying home circumstances) when needed.

- **Efforts to provide vaccinations to school communities**: The school district has hosted vaccination clinics for school staff and students 16 and older. School nurses provide information to any family seeking access to vaccination.

(ECF No. 13, pp. 3-7). Critically, the Plan also provides for the following "[a]ppropriate accommodations for students with disabilities with respect to health and safety policies:" "***The School District will review additional mitigation options for staff members and students who***

---

[9] At argument, Defendants' counsel represented that students are spaced six feet apart at lunch. (Tr. at 32).

***are at higher risk for severe illness, including necessary accommodations under the ADA,
Section 504, or the IDEA***."   (ECF No. 13, p. 7) (emphasis added).   During argument, these
provisions were referenced by counsel for Defendants, who explained that accommodations
granted to students "who are at higher risk for severe illness" include a variety of measures,
including distancing, special seating in classrooms and, if necessary, at-home instruction or
virtual classes.   (Tr. at 39-43).

Despite those safety measures and possible accommodations, Plaintiffs take the position
that the *only* reasonable accommodation appropriate in light of child Plaintiffs' conditions is a
requirement of universal masking in the School District.   It bears repeating what was stated
above:   Plaintiffs do not ask for an accommodation permitting Child Does 1-5 to mask.   They
have every right to do so.   Rather, they take the position that the only appropriate
accommodation is to mandate that the *entire* school community mask so long as transmission of
COVID-19 in Allegheny County is at a "substantial" or "high" level.[10]   Moreover, Plaintiffs'
request is without limitation on duration.   While Plaintiffs' counsel expressed hope that COVID-
19 infection numbers fall beneath the "substantial" threshold this year, and suggested that the
requested relief is limited to this year, there is no guarantee that will occur.   Moreover, the
specific relief requested by the TRO and proposed order would require masking indefinitely, so
long as the number of cases is "substantial" or higher.   (Tr. at 14-15) ("Since the science and the
medicine tells us that a virus doesn't go away by a deadline, we have to use a different metric.
And the metric we're doing is the one that medical professionals rely upon, and its that if the

---

[10]   The CDC defines "substantial transmission" as 50-99.99 total new cases per 100,000 persons
in the past 7 days.   "High transmission" is defined as greater or equal to 100 new cases per
100,000   persons   in   the   past   7   days.   www.cdc.gov/coronavirus/2019-
ncov/more/aboutcovidcountycheck/index.html (last visited Jan. 20, 2022).

COVID transmission rate, per the CDC for Allegheny County only, is in the substantial or high basis, then masking should stay in place.").[11]

The Court holds that it is unlikely that Plaintiffs will be able to meet their burden of establishing that the accommodation they seek is reasonable under the ADA and Rehabilitation Act. The law is clear that a public entity need only provide a *reasonable* accommodation, not a plaintiff's preferred or requested accommodation. *See, e.g.*, *Berardelli*, 900 F.3d at 125; *Pahlavan*, 438 F. Supp. 3d at 421. The School District has a number of safety measures in place and, in addition, offers, as a matter of official policy, individualized accommodations to meet students' specific health-related needs and to afford them access to an education. But Plaintiffs take the position that *only* universal masking is an acceptable accommodation. The Court finds that Plaintiffs' position, when finally reviewed on the merits, will be found to be unreasonable. *See, e.g.*, *L.E. v. Ragsdale*, ____ F. Supp. 3d _____, 2021 WL 4841056, at *3 (N.D. Ga. Oct. 15, 2021) ("While Plaintiffs may prefer a mask mandate and other stricter policies, Defendants are not required to provide Plaintiffs with their preferred accommodation. So long as Plaintiffs are offered meaningful access to education—and the Court finds that they have been—Defendants have adequately accommodated Plaintiffs and their disabilities.").

---

[11] With a population of 1.216 million, 607 cases per 7 days would be enough to bring Allegheny County into the "substantial" category. The CDC's definitions were calibrated to the earlier Delta variant of COVID-19, rather than the significantly more transmissible Omicron variant, which currently accounts for nearly all new infections. With COVID-19 becoming endemic and with a much more transmissible variant, one wonders whether the numbers will ever be low enough to fall below the "substantial" category and/or whether each winter, as respiratory infections seasonally increase, the number will again increase to a level requiring masking under Plaintiffs' position. Plaintiffs seem to acknowledge that this could be an issue, and their counsel conceded that the CDC "may revise those guidelines. And if they revise them based upon the level of Omicron, they may up the number of transmissions so that the barometer they're using makes it more flexible." (Tr. at 17-18).

While not alone dispositive, the unreasonableness of Plaintiffs' position is highlighted by its unprecedented nature. Although immunocompromised children have always been present in our schools, and communicable diseases have always circulated, prior to COVID-19 there was never an argument for mandatory, indefinite, universal masking in schools—much less the argument that the failure of a school district to mandate universal masking constitutes a violation of federal law. Aside from cases addressing COVID-19, the Court was unable to locate a single case where a court held that a reasonable accommodation for an immunocompromised or otherwise vulnerable person was to require all other students and staff of a school, or constituents of an institution or community, to wear a mask or any other type of personal protective equipment.[12]

The unreasonable nature of Plaintiffs' position is further highlighted by the fact that, while it imposes an unprecedented requirement upon the School District—*i.e.*, mandate universal masking of all students, faculty, and staff or violate the ADA and the Rehabilitation Act—it is not guaranteed to be effective. In other words, Plaintiffs may *still* become infected with COVID-19. It is common knowledge that wearing a mask is no guarantee against infection. Counsel for Defendants stated that, even with universal masking, the School District still had a number of cases since the onset of Omicron. (Tr. at 43). Moreover, Plaintiffs' request does not specify a particular type of mask—notwithstanding the fact that public health authorities have called into question the effectiveness of, for example, cloth masks against the Omicron variant. *See* www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/types-of-masks.html (last visited Jan. 20, 2022).

---

[12] Counsel for Plaintiffs was, likewise, unable to cite to a single such case. (Tr. at 24-25).

For these reasons, the Court holds that Plaintiffs' request for the indefinite imposition of universal masking will not be found to be a reasonable accommodation when the claims are finally decided on the merits.  Because Plaintiffs will likely fail to meet their initial burden of showing that their requested accommodation is reasonable, the burden does not shift to Defendants "to demonstrate that the requested accommodations were unreasonable," *Muhammad*, 483 F. App'x at 763, and it is unnecessary to examine whether the requested accommodation would require "'substantial' changes to the school's programs," *Ridley Sch. Dist.*, 680 F.3d at 280 (citation omitted).

### 4.  Conclusion—Likelihood of Success on the Merits

As explained above, the Court concludes that Plaintiffs have failed to demonstrate a reasonable likelihood of success on the merits for three reasons: (1) it is unlikely that they will be able to demonstrate Article III standing; (2) they will likely be found to have failed to exhaust administrative remedies; and (3) the sole accommodation that they request under the ADA and the Rehabilitation Act will likely be found unreasonable.  Because Plaintiffs have failed to demonstrate a reasonable likelihood of success on the merits, they have failed to meet their burden for a temporary restraining order.

### B.  Other considerations weigh against injunctive relief.

Having held that Plaintiffs have not shown that they are reasonably likely to succeed on the merits of their claims, the Court is not required to examine the other three prongs of the inquiry for a TRO—*i.e.*, (2) whether the movant will suffer irreparable injury unless the injunction issues; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether the public interest favors such relief.  The Court will, however, briefly address considerations that implicate, directly and indirectly, the last two

factors because of the novelty and timeliness of the issues presented in this matter.  The Court holds that granting this TRO would risk imposing substantial harm upon the School District and that doing so would run contrary to the public interest.  Specifically, the Court believes that granting the relief sought would risk upsetting the system of popular governance of schools that is an important part of our system of layered and answerable government.

The sole accommodation demanded by Plaintiffs would supersede the democratic vote of the School Board on an issue that elicits strong feelings not only from Plaintiffs, but also from other members of the public.  Further, the legal theory proffered by Plaintiffs unduly amplifies the authority of CDC recommendations while, at the same time, severely curtailing the practical authority of the people, through their elected school directors, to make decisions on matters of prudential judgment.  Plaintiffs' position if accepted, would essentially graft the recommendations of the CDC into the ADA and the Rehabilitation Act.  And as a practical matter, elevating CDC recommendations to the level of law would serve to take many decisions relating to health policy and directly impacting citizens out of the hands of their elected representatives and put them into the hands of unknown and unanswerable CDC decisionmakers and unelected and unanswerable federal judges.

The district court in *Ragsdale* reached a similar conclusion that, while couched in terms of an accommodation under the ADA, the plaintiffs were really asking the court to overrule the vote of the appropriate public entity.  *See Ragsdale*, 2021 WL 4841056, at *4 ("Plaintiffs essentially ask this court to second-guess Defendants' operational decision making and wrest from Defendants' control the authority to decide how to best project students' health.  The Court . . . declines Plaintiffs' invitation to usurp this function of the executive branch.").  In a similar vein, Justice Gorsuch recently noted in a case dealing with other COVID-19 mitigation measures

that "[t]he central question we face today is: Who decides?"   *NFIB v. Dep't of Lab.,*
*Occupational Safety and Health Admin.*, 595 U.S. ____ , 2022 WL 120952, at *5 (2022)
(Gorsuch, J., concurring).   There is no question that COVID-19 has challenged every American
institution.   This Country will continue to face challenges that have scientific or technical
considerations which are informed by experts within or outside of government.   Governments at
all levels would do well to weigh and consider the advice offered by those experts.   However, in
a democratic republic, the ultimate answer to the question of "who decides" must be the people
through their elected and answerable representatives.

In this case, the Court believes that the entry of a TRO would damage the independence
and authority of the School Board—the directly elected body entrusted by State law with setting
policy for the School District.   It would lead, in practical effect, to the elevation of CDC
recommendations beyond their appropriate level of authority and to the exclusion of local,
democratic authority over matters of prudential judgment.   The Court holds that these
considerations weigh in favor of a finding that entry of a TRO would be contrary to the public
interest.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiffs' Emergency Motion for a Temporary
Restraining Order (ECF No. 2) will be denied.  An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

1/21/22
Dated